2018 IL App (1st) 200941-U
No. 1-20-0941

SECOND DIVISION
June 29, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| IN THE INTEREST OF: S.R., a minor, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| (The People of the State of Illinois | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | No. 19JD1658 |
| | ) | |
| v. | ) | |
| | ) | The Honorable |
| S.R., | ) | Terrence V. Sharkey, |
| | ) | Judge Presiding. |
| Respondent-Appellant). | ) | |

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Fitzgerald Smith and Justice Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held:* circuit court order adjudicating minor respondent delinquent of the offense of aggravated unlawful use of a weapon affirmed where there was sufficient evidence that respondent constructively possessed the firearm at issue and where the circuit court properly denied his pretrial motion to suppress evidence.

¶ 2    Following a bench trial conducted in accordance with the Juvenile Court Act of 1987 (705 ILCS 405/5-1 *et seq.* (West 2014)), minor respondent S.R. was adjudicated delinquent of aggravated unlawful use of a weapon and was sentenced to 18 months' probation.  On appeal, respondent seeks reversal of his delinquency adjudication, contending that the State failed to

establish his guilt beyond a reasonable doubt. Alternatively, he argues that reversal is warranted because the circuit court erred in denying his pretrial motion to suppress. For the reasons set forth herein, we affirm the judgment of the circuit court.

¶ 3        BACKGROUND

¶ 4        On October 16, 2019, a firearm was recovered from a vehicle that 17-year-old respondent had been driving. The State subsequently filed a petition for adjudication of wardship alleging that respondent was delinquent of several firearm offenses, including aggravated unlawful use of a weapon (720 ILCS 5/24-1.6(a)(1) (West 2018)) and unlawful possession of a firearm (720 ILCS 5/24-3.1(a)(1) (West 2018)).

¶ 5        Prior to trial, respondent moved to quash his arrest and suppress the firearm, arguing that at the time he was detained and searched, law enforcement officials lacked reasonable suspicion or probable cause to believe that he had committed, was committing, or was about to commit a criminal offense. Because the seizure and search at issue were purportedly conducted in contravention of his fourth amendment constitutional rights, respondent sought suppression of all evidence gleaned directly or indirectly from the officers' unlawful conduct. The circuit court subsequently presided over a hearing on the motion.

¶ 6        At the suppression hearing, respondent testified that on October 16, 2019, at approximately 10 p.m., he was with three friends—Christian Alva, Jerson Velenzuela, and Juan Martinez—in the vicinity of 44th and Whipple. He and his friends, who had just finished eating a meal at a Hooter's restaurant, were passengers in Alva's Chevrolet Trailblazer. Respondent testified that Alva stopped his vehicle in the "middle of the block" and activated his emergency lights. At that point, respondent exited Alva's vehicle and walked to the "end of the block" where his car, a Nissan Infiniti, was parked approximately five car-lengths away. When he reached his vehicle,

respondent retrieved Jerson's backpack from the trunk of his car, walked back to Alva's vehicle, and reentered the Trailblazer with Jerson's backpack. After he did so, several police officers approached Alva's vehicle after detecting "a strong odor of marijuana," and ordered respondent and his friends out of the Trailblazer. They complied and the officers "checked" them and "patted [them] down." Respondent testified that he had his "belongings" in his hands and that an officer "asked" respondent to give him his keys. After the officers obtained his keys, they searched his vehicle and recovered a firearm during the search. Respondent did not give the officers permission to search his car.

¶ 7        On cross-examination, respondent admitted that he and his friends had smoked marijuana in Alva's vehicle "a while back" and that the Trailblazer smelled like burnt cannabis. He further testified that the officers did not ask him whether he owned the Infiniti prior to searching the vehicle. He explained that one of the officers who had stopped respondent and his friends "already knew" respondent because he had stopped respondent "a couple [of] weeks" prior to the October 16, 2019, encounter. During the previous encounter, the officer had ordered him to move his vehicle, which he had parked in an alley, to the street. Respondent also clarified that he did not "give" the officers his car keys. Instead, an officer reached into his pockets, and when respondent tried to "grab" his keys, the officer "pulled" on the keys "aggressively," and threatened to "drop" him if he did not let go of them. The officers then handcuffed respondent and placed him in the back of a police truck before they went to search his vehicle. Respondent did not observe the officers recover a firearm from his vehicle; rather, he was told that the search had yielded the weapon when he was at the police station later that night. Respondent testified that he did not know that a firearm was in his vehicle and did not know where in the vehicle the officers discovered the gun. Although he admitted that he had retrieved Jerson's bookbag from the trunk

of his vehicle, he denied that he had observed a firearm in the trunk at that time. Finally, respondent confirmed that nobody else accompanied him to his vehicle to retrieve the bookbag.

¶ 8     Following respondent's testimony, his attorney rested without presenting any additional evidence. The State moved for a directed finding, but the motion was denied. Thereafter, the State called Chicago police officer Arturo Guzman to provide testimony about the circumstances of the search and seizure at issue.

¶ 9     Officer Guzman testified that at approximately 10 p.m. on October 16, 2019, he and his partner, Michael Carrasco, were in an unmarked vehicle in the vicinity of 4441 South Whipple Street. He described the area as a high-crime residential neighborhood and explained that he had recovered "over 10" guns from that area during the first two years that he was first assigned to patrol that neighborhood. Officer Guzman testified that he and his partner had driven to that location in response to a ShotSpotter alert that shots had been fired in the vicinity of 44th and Whipple. They had been approximately three blocks away when the alert had issued and responded to that area within "seconds" of receiving the alert. When they arrived at the location, they observed two vehicles: a Chevrolet SUV and a Nissan Infiniti. Officer Guzman initially observed the vehicles traveling southbound on Whipple Street before they stopped in front of a school. The Infiniti stopped first and the Trailblazer stopped immediately behind it. As Officer Guzman and his partner drove alongside the two stopped vehicles, he observed "about four" people inside the Trailblazer. Respondent, in turn, was driving the Infiniti. He also noticed a "strong odor" of "burnt cannabis" coming from the direction of the stopped vehicles. As they were passing the cars, Officer Guzman observed respondent exit the Infiniti with a backpack in his hands. He then opened the rear passenger passenger-side door of the Infiniti, retrieved an item from his person, "drop[ped] something" inside the vehicle, and closed the door. Respondent then took the

backpack, walked to the Trailblazer, and entered the SUV. Officer Guzman testified that nothing obstructed his view when he observed respondent. Moreover, although it was dark, streetlights illuminated the area.

¶ 10    After making these observations, Officer Guzman and his partner made a U-turn, stopped their vehicle next to Trailblazer, and "activated [their] lights to conduct a field interview." The officers again noticed a strong odor of cannabis and ordered all the occupants out of the Trailblazer. After the occupants exited the vehicle, Officer Guzman walked over to the Infiniti, and used his flashlight to look inside of the vehicle. When he did so, he observed "a bullet, a live round, in the back seat." The bullet was in the same area that respondent had accessed moments earlier. After observing the bullet, Officer Guzman asked who the Infiniti belonged to and respondent indicated that it was his vehicle. Officer Guzman then asked respondent if he had a driver's license and respondent responded "no." When he asked respondent for the keys to the vehicle, respondent failed to comply. Officer Guzman testified that he "eventually retrieved the keys" from respondent's pocket and used them to unlock the Infiniti and retrieve the live round. As he did so, he observed a "compartment" that allowed "access to the trunk of the vehicle." He shined his flashlight into the compartment and observed "the butt of a gun." He testified that the compartment was located in the same area in which respondent had reached into the vehicle minutes earlier. Officer Guzman unlocked the trunk and retrieved the firearm.

¶ 11    On cross-examination, Officer Guzman admitted that when he first observed respondent, he did not observe respondent do anything illegal; rather, he simply saw him "reach in[to] the back passenger seat" of the Infiniti. Moreover, he did not know what specifically respondent did when he reached into the rear passenger-side door of his vehicle. Officer Guzman also acknowledged that he did not see the firearm when he initially stood outside the Infiniti and used his flashlight to

illuminate the interior of the vehicle. He further acknowledged that respondent did not willingly give him his car keys and did not consent to his search of the Infiniti. Officer Guzman clarified that the bullet was recovered from the rear passenger seat of the vehicle and that respondent was not arrested or put into the back of his police car until after he recovered the firearm from the Infiniti. Respondent was the only individual he observed access the Infiniti.

¶ 12 Following Officer Guzman's testimony, the State rested, and the defense presented no evidence in rebuttal. After considering the testimony and the arguments of the parties, the circuit court denied respondent's motion to quash his arrest and suppress evidence. In doing so, the court found that respondent testified "poorly overall." In reviewing the testimony, the court found that at the time respondent was seized, the officers had probable cause to arrest him after they detected the odor of marijuana as well as the fact that he admitted to operating a motor vehicle without a license. As such, the seizure was not conducted in contravention of respondent's fourth amendment rights. The court further found that the search of the Infiniti was also lawful because the officers had probable cause to believe the vehicle contained evidence of a crime. The cause then proceeded immediately to a bench trial.

¶ 13 At the trial, the State recalled Officer Guzman to provide additional testimony about his encounter with respondent on October 16, 2019. His testimony was consistent with the account he provided at the suppression hearing. He reiterated that he observed respondent stop the Infiniti, exit the driver's seat with a backpack, and approach the rear passenger side of the vehicle. It appeared that respondent was "trying to place an object or something in the vehicle." At the time that he observed respondent, Officer Guzman was only "a couple feet away" from him and nothing obstructed his view of respondent's movements inside the vehicle. In addition, respondent was the only individual he observed access the Infiniti. When Officer Guzman later looked inside the

Infiniti, he saw a bullet on the rear passenger seat of the car, which was the same area of the vehicle he had observed respondent access moments earlier. Officer Guzman also reiterated that he observed the firearm at issue through a "back hatch" compartment located in rear of the vehicle and that he retrieved the firearm by opening the vehicle's trunk. Based on its placement in the vehicle, the firearm was accessible to respondent from the backseat of the vehicle, the same area in which Detective Guzman saw him appear to "place[] something" into the car. The firearm was a black "semiautomatic weapon" and appeared to be in proper working order. It was secured and inventoried in accordance with police protocol.

¶ 14    Following respondent's arrest, he was processed. During processing, Detective Guzman ascertained that respondent was 17-years old, did not possess a valid Firearm Owner's Identification (FOID) card, was not in his own abode, land, or fixed place of business at the time the firearm was recovered, and was not engaged in hunting or any sanctioned activity under the Illinois Wildlife Code when the gun was discovered.

¶ 15    On cross-examination, Officer Guzman acknowledged he did not observe respondent open the trunk or the back hatch of the Infiniti. Moreover, he never actually observed respondent place a specific item in the vehicle or touch the firearm. Officer Guzman also acknowledged that the Infiniti was not actually registered to respondent[1] and no fingerprint analysis was conducted on the firearm that he recovered from that vehicle.

¶ 16    Following Officer Guzman's testimony, the State rested. The defense moved for a directed finding, but the motion was denied. Respondent elected not to testify, and the defense rested without presenting any evidence. After considering the evidence and the arguments of the parties,

_____

[1] Based on discussions during pretrial proceedings, it appears that the Infiniti was registered to respondent's mother; however, no evidence pertaining to the registration of the vehicle was established during the trial.

the court found respondent delinquent of one count of aggravated unlawful use of a weapon and one count of unlawful possession of a weapon. In doing so, the court expressly found Officer Guzman's testimony to be "very credible" and concluded that his testimony established that respondent had constructive possession of the firearm given that he was observed operating the Infiniti and accessing an area of the vehicle that contained a compartment that opened to the trunk, where the firearm was ultimately recovered.

¶ 17    At the sentencing hearing that followed, the parties presented evidence in aggravation and mitigation. Given respondent's lack of prior criminal history, the court sentenced him to 18 months' probation. This appeal followed.

¶ 18    ANALYSIS

¶ 19    Sufficiency of the Evidence

¶ 20    On appeal, respondent challenges his delinquency adjudication, arguing that the State failed to prove he committed the offense of aggravated unlawful use of a weapon beyond a reasonable doubt. Specifically, he argues that the State failed to prove that he knew that a gun was present in the Infiniti's trunk and that he had constructive possession of the firearm.

¶ 21    The State responds that the evidence "was sufficient to support a finding that respondent possessed the gun found in the trunk of the Infiniti." The State submits that evidence showed that respondent tried to conceal the firearm in the vehicle and that he had the intent and capability to maintain control over it given his access to, and claimed ownership interest in, the vehicle. As such, the State argues that the evidence "was sufficient to prove possession under both actual possession and constructive possession theories."

¶ 22    Due process requires proof beyond a reasonable doubt to convict any person of a criminal offense. *People v. Ross*, 229 Ill. 2d 255, 272 (2008). This standard is applicable to juvenile

delinquency proceedings. *In re Q.P.*, 2015 IL 118569, ¶ 24; *In re Jonathan C.B.*, 2011 IL107750, ¶ 47. In reviewing a challenge to the sufficiency of the evidence, it is not a reviewing court's role to retry the respondent; rather, "in delinquency proceedings, as in criminal cases, a reviewing court must decide ' "whether, [after] viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " *In re Q.P.*, 2015 IL 118569, ¶ 24 (quoting *People v. Austin M.*, 2012 IL 111194, ¶ 107, quoting *In re Jonathan C.B.*, 2011 IL107750, ¶ 47). Because the trier of fact is in the best position to evaluate the credibility of the witnesses, draw reasonable inferences from the evidence, and resolve any inconsistencies in the evidence (*Austin M.*, 2012 IL 111194, ¶ 107; *In re Jonathon C.B.*, 2011 IL 107750, ¶ 59), a reviewing court will not substitute its judgment for that of the trier of fact and will not reverse a respondent's delinquency adjudication unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt as to his guilt (*In re Q.P.*, 2015 IL 118569, ¶ 24).

¶ 23     A person commits the offense of aggravated unlawful use of a weapon, when "he or she knowingly *** carries or possesses on or about his or her person or in any vehicle or concealed on his or her person except when on his or her land or in his or her abode, legal dwelling, or fixed place of business, or on the land or in the legal dwelling of another person as an invitee with that person's permission, any pistol, revolver, stun gun or taser or other firearm" and one or more of the statute's aggravating factors are present. (720 ILCS 5/24-1.6(a) (West 2018). In this case, the aggravating factor was the fact that respondent possessed a firearm while he was "under 21 years of age" (720 ILCS 5/24-1.6(a)(1), (3)(I) (West 2018)).

¶ 24     The element of possession involves an issue of fact, and accordingly, the circuit court's finding, in a bench trial, that a defendant possessed a firearm will not be disturbed unless its conclusion is

so unreasonable that it creates doubt as to the defendant's guilt. *People v. Jones*, 2019 IL App (1st) 170478, ¶ 27. Possession is rarely susceptible to direct proof; rather, it is often established by circumstantial evidence. *People v. Love*, 404 Ill. App. 3d 784, 788 (2010). In addition, possession of a firearm can be actual or constructive. *Jones*, 2019 IL App (1st) 170478, ¶ 27; *People v. Nesbit*, 398 Ill. App. 3d 200, 209 (2010). "Actual possession is the exercise by the defendant of present personal dominion over the illicit material." *People v. Givens*, 237 Ill. 2d 311, 335 (2010). Although present personal touching of a firearm is not required to prove that the defendant had actual possession of a firearm (*Id.*), actual possession can be proven by testimony that the defendant had the weapon " 'on his person, tried to conceal it, or was seen to discard it.' " *People v. Wise*, 2021 IL 125392, ¶ 24 (quoting *Jones*, 2019 IL App (1st) 170478, ¶ 27).

¶ 25    Constructive possession of a firearm, in turn, " 'may be shown where the person has knowledge of the possession of the weapon and exercises immediate and exclusive control over the area where the firearm is found.' " *Id*. ¶ 25 (quoting *People v. Brown*, 2020 IL 124100, ¶ 11). In many cases, knowledge of the presence of contraband may be inferred from a defendant's control over the area in which the contraband was discovered. *People v. Bogan*, 2017 IL App (3d) 150156, ¶ 29. When a firearm is recovered from a vehicle, however, "the State cannot rely on an inference of knowledge from the defendant's presence in a motor vehicle where a weapon is found;" rather, "the State must present other evidence establishing defendant's knowledge of the weapon." *Nesbit*, 398 Ill. App. 3d at 209. A defendant's knowledge of a weapon "may be 'inferred from several factors, including: (1) the visibility of the weapon from defendant's location in the vehicle, (2) the amount of time in which defendant had an opportunity to observe the weapon, (3) gestures or movements made by defendant that would suggest an effort to retrieve or conceal the weapon, and (4) the size of the weapon." *Id*. at 209-10 (quoting *People v. Ingram*, 389 Ill. App. 3d 897, 900 (2009)). In

addition, "[k]nowledge may be proven by evidence of a defendant's acts, declarations or conduct from which it can be inferred he knew the contraband existed in the place where it was found." *People v. Ross*, 407 Ill. App 3d 931, 936 (2011); see also *People v. Thomas*, 2019 IL App (1st) 162791, ¶ 27 (recognizing that a defendant's knowledge of the presence of a firearm "may also be demonstrated by his statements or conduct upon encountering the police").

¶ 26    Initially, we note that the State's theory at trial was that respondent was guilty of aggravated unlawful use of a weapon because he was in constructive possession of the firearm. The State never advanced a theory of actual possession at trial. Nonetheless, as will be explained below, because we find that the evidence at trial was sufficient to support a finding that respondent constructively possessed the firearm at issue, we need not address the merit of the State's alternative actual possession theory.

¶ 27    At trial, Officer Guzman testified that he and his partner were on routine patrol when they responded to the area of 44th and Whipple within "seconds" of receiving a ShotSpotter alert that shots had been fired in that vicinity. Upon arriving at that location, Officer Guzman observed two vehicles: a grey Infiniti driven by respondent and an SUV containing several occupants. After both vehicles came to a stop in front of a school, respondent exited the Infiniti's driver's seat with a backpack and approached the rear passenger side of the vehicle. It appeared to Officer Guzman that respondent "place[ed] an object or something" inside of the Infiniti. Respondent then walked to the SUV, which smelled of marijuana, and entered the vehicle. After the officers ordered respondent and the other passengers out of the SUV, Officer Guzman walked to the Infiniti, illuminated the interior of the vehicle with his flashlight, and observed a bullet on the rear passenger seat, the same area of the vehicle that he had observed respondent access moments earlier. Officer Guzman asked who owned the Infiniti and respondent admitted that it was his car

and that he did not have a driver's license. When he asked for respondent's keys, respondent initially refused to comply. After he was ultimately able to obtain the keys, Officer Guzman retrieved the bullet from the rear passenger seat. When he did so, he observed a compartment that afforded access to the trunk of the vehicle. Officer Guzman used his flashlight to "look in the back where the compartment was down" and "observed the butt of a gun." The compartment was also located in the same area of the vehicle where he observed respondent seem to "place" an item moments earlier. Respondent was the only individual who Officer Guzman observed operate and access the Infiniti.

¶ 28    As a threshold matter, we note that respondent does not appear to dispute that Officer Guzman's testimony was sufficient to support a finding that he exercised control over the Infiniti, the vehicle in which the firearm was found; rather, he simply argues that the officer's testimony failed to show that he had the requisite knowledge that the firearm was in the vehicle to support a finding that he constructively possessed the weapon. Viewing the evidence in the light most favorable to the State (*In re Q.P.*, 2015 IL 118569, ¶ 24), however, we find the evidence was sufficient to support a finding that respondent had both exclusive and immediate control of the Infiniti and knowledge of the presence of the firearm in the vehicle. With respect to the element of control, we acknowledge that the evidence at trial revealed that respondent was not, in fact, the owner of the Infiniti. We note, however, that " '[i]t is control of a vehicle where [contraband is found], rather than ownership, which is pertinent to proving exclusive control of the area.' " *Bogan*, 2017 IL App (3d) 150156, ¶ 32 (quoting *People v. Robinson*, 233 Ill. App 3d 278, 287 (1992)). Here, respondent possessed the keys to the vehicle and was the only individual who was observed driving and accessing the Infiniti. Such evidence was sufficient to support a finding that

respondent had control of that vehicle. See, *e.g., Id.* ¶ 42 (recognizing that "direct evidence of a defendant driving a vehicle is surely sufficient evidence of control" over that vehicle).

¶ 29 We further find that there was sufficient circumstantial evidence that respondent knew the firearm was in the vehicle. As set forth above, courts may consider several factors to ascertain whether there is sufficient evidence to support an inference that a defendant knew a firearm was present in a vehicle, including: (1) the visibility of the weapon from the defendant's location in the vehicle; (2) the amount of time the defendant had to observe the weapon; (3) gestures or movements made by the defendant that would suggest efforts to retrieve or conceal the weapon; and (4) the size of the firearm. *Nesbit*, 398 Ill. App. 3d at 209. With respect to the first factor— the visibility of the weapon—respondent suggests that there is no evidence he saw the weapon because it was found in the trunk and he was never observed accessing the trunk. Although it is true that Officer Guzman did not observe respondent open the trunk, he did observe him reach into the rear passenger side of the vehicle, which contained a hatch compartment that allowed access to the trunk. It is not clear from the record whether the hatch was fully open or closed when Officer Guzman commenced his search of the vehicle, but he testified that the butt of the weapon was visible when looked into the compartment's opening. In addition, Officer Guzman also observed respondent make several movements that could be construed as consistent with an effort to conceal the weapon. Specifically, Officer Guzman testified that when respondent exited the driver's seat of the Infiniti and walked to the rear passenger side of the vehicle, he appeared to "place an object or something in the vehicle." Although he was unable to see precisely what respondent put in the vehicle, the movements were made in the same area of the vehicle in which the bullet and the rear hatch compartment were located. Therefore, the third factor also supports an inference of knowledge. We acknowledge that the record does not contain any evidence as to how long

respondent had been driving the Infiniti before the weapon was found and or the exact size of the firearm.[2] As such, neither the second nor the fourth factors assist this court in ascertaining whether respondent's knowledge of the presence of the weapon in the Infiniti can be inferred.

¶ 30    Ultimately, however, viewing the evidence in the light most favorable to the State, we find that the totality of the circumstances supports a finding that respondent knew the firearm was in the vehicle. We reiterate the respondent was the sole occupant and driver of the vehicle and was observed making movements that were consistent with placing an item in the area of the vehicle in which a bullet and a hatch compartment that provided access to the trunk were located. See, *e.g., Nesbit*, 398 Ill. App. 3d at 210-11 (finding that the defendant possessed the requisite knowledge that the firearm at issue was in the vehicle where the testimony of law enforcement officials established that the defendant was in close proximity to the firearm and made movements consistent with efforts to conceal the weapon even though the remaining two factors were not applicable); *People v. Grant*, 339 Ill. App. 3d 792 (2003) (finding there was sufficient evidence that the defendant constructively possessed the firearm recovered from a vehicle where he was observed making movements in the area where the weapon was recovered). In addition, respondent's initial refusal to provide Officer Guzman with the keys to the vehicle can be construed as additional *indicia* of knowledge. See, *e.g., Ross*, 407 Ill. App 3d at 936 (knowledge can be established through a defendant's conduct).

¶ 31    In so finding, we are unpersuaded by respondent's reliance on *People v. Hampton*, 358 Ill. App. 3d 1029 (2005). In that case, the defendant, who was driving his deceased brother's vehicle, was arrested after police discovered he was driving on a suspended license during the course of

---

[2] Officer Guzman testified that the gun was a black semiautomatic handgun. Although the make and model of the gun was not established, he did acknowledge at trial that the gun could be concealed.

traffic stop. *Id*. at 1030. During a search of the vehicle, officers discovered a tube sock containing a loaded handgun in the glove compartment and the defendant was charged with, and subsequently convicted of, a firearm offense. *Id*. On appeal, the Second District reversed the conviction, finding that the State failed to show that the defendant had the requisite knowledge of the firearm to establish that he constructively possessed the weapon. *Id*. at 1032-33. In doing so, the court emphasized that uncontradicted testimony established that the defendant began driving the vehicle at issue shortly before the traffic stop and that he had never driven the vehicle on any prior occasion. *Id*. at 1033. Given the lack of evidence that the defendant exercised "regular, ongoing control" of the vehicle at issue, the Second District concluded that it was not reasonable to infer that he had knowledge of the gun simply because of the fact that he happened to be driving the vehicle in which the firearm was recovered. *Id*. at 1032-33. The court further found that the State failed to present sufficient circumstantial evidence to infer that the defendant possessed the requisite knowledge that the firearm was present in the vehicle in order to support a finding of constructive possession. *Id*. at 1033. Applying the four-factor test, the court noted that: (1) the firearm, which was concealed inside the glove compartment, was not visible to the defendant; (2) the defendant did not have a significant opportunity to observe the weapon given that he had only been driving the vehicle for a "few minutes" before the traffic stop; (3) the defendant never made any furtive movements toward the weapon; and (4) the firearm was small enough to fit inside of a sock and was thus easily concealed. *Id*. Because no reasonable trier of fact could have found that the defendant knowingly possessed the handgun based on these facts, the court reversed his conviction. *Id*.

¶ 32     Although respondent, like the defendant in *Hampton*, was driving a vehicle that was not registered to him, the record in this case does not contain incontrovertible evidence that he lacked

familiarity with the vehicle or that he was driving it for the first time. Instead, when asked, respondent actually claimed ownership of the vehicle, which could be construed as evidence that he exercised regular control over the vehicle even though it was not actually registered under his name. Moreover, respondent, unlike the *Hampton* defendant, was observed making movements that were consistent with efforts to conceal a weapon. Specifically, Officer Guzman testified that respondent appeared to "place' something into the vehicle when he accessed the rear passenger side of the car. He further testified that the rear passenger side of the vehicle contained access to a hatch compartment that opened to the trunk and that the butt of the firearm was visible from the opening of the hatch compartment. Given these factual differences, we do not find that *Hampton* compels a different result. Accordingly, we reject respondent's challenge to the sufficiency of the evidence.

¶ 33     Motion to Suppress

¶ 34     Alternatively, respondent submits that his delinquency adjudication should be reversed because the search of the Infiniti was conducted in contravention of his fourth amendment rights.[3] Specifically, he argues that the warrantless vehicle search was conducted absent probable cause or reasonable suspicion that the vehicle contained evidence of a crime. Moreover, he submits that the search was not justified as a search incident to a lawful arrest.

¶ 35     The State, in turn, argues that the search of the Infiniti was "reasonable and comported with [f]ourth [a]mendment jurisprudence" because the "police had probable cause to believe respondent's car contained evidence of the recent shooting and [his] possession of marijuana."

_____

[3] Respondent does not dispute that the seizure was lawful; rather, his argument pertaining to the circuit court's ruling on his motion to suppress is limited to the propriety of the search of his vehicle.

¶ 36    As a general rule, a circuit court's ruling on a motion to suppress is subject to a bifurcated two-prong standard of review. *Ornelas v. United States*, 517 U.S. 690, 699 (1996); *People v. Johnson*, 237 Ill. 2d 81, 88 (2010). Pursuant to this standard, a reviewing court will afford great deference to the circuit court's factual findings and will disregard those findings only where they are against the manifest weight of the evidence. *Johnson*, 237 Ill. 2d at 88; *People v. Lopez*, 2013 IL App (1st) 111819, ¶ 17. The circuit court's ultimate legal finding as to whether suppression is warranted, however, is subject to *de novo* review. *People v. Colyar*, 2013 IL 111835, ¶ 31; *People v. Bartelt*, 241 Ill. 2d 217, 234 (2011). Accordingly, "[a] court of review 'remains free to engage in its own assessment of the facts in relation to the issues presented and may draw its own conclusions when deciding what relief should be granted.' " *People v. Gherna*, 203 Ill. 2d 165, 175-76 (2003) (quoting *People v. Crane*, 195 Ill. 2d 42, 51 (2001)). When conducting this analysis, a reviewing court may consider the evidence presented at trial in addition to the evidence presented during the prior suppression hearing. *People v. Almond*, 2015 IL 113817, ¶ 55

¶ 37    The right to be free from unlawful searches and seizures is protected by both the federal and state constitutions. U.S. Const., amend. IV; Ill. Const. 1970 art. I, § 6; *People v. Bartlett*, 241 Ill 2d. 217, 226 (2011). These constitutional protections were designed to safeguard the reasonable expectations of privacy that people possess regarding their persons, residences, and belongings. *People v. Parker*, 354 Ill. App. 3d 40, 44 (2004). "The 'essential purpose' of the fourth amendment is to impose a standard of reasonableness upon the exercise of discretion by law enforcement officers to safeguard the privacy and security of individuals against arbitrary invasions." *People v. McDonough*, 239 Ill. 2d 260, 266-67 (2010) (*quoting Delaware v. Prouse*, 440 U.S. 648, 653-55, 99 S. Ct. 1391, 1396, 59 L. Ed. 2d 660, 667 (1979)).

¶ 38     As a general rule, searches conducted absent a warrant supported by probable cause are considered *per se* unreasonable. *People v. Hill*, 2020 IL 124595, ¶ 20. There are exceptions to the warrant requirement, however. *Id.* Pursuant to the automobile exception, law enforcement officials may conduct a warrantless search of a vehicle where they have probable cause to believe that the vehicle contains contraband or evidence of criminal activity that is subject to seizure. *People v. Contreras*, 2014 IL App (1st) 131889, ¶ 28. "Stopping an automobile for a minor traffic violation does not justify a search of a detainee's person or vehicle; instead, the officer must reasonably believe he is confronting a situation more serious than a routine traffic violation." *Id.* The scope of a search conducted pursuant to the automobile exception extends to every part of a vehicle. *Parker*, 354 Ill. App. 3d at 947. The rationale behind the automobile exception to the warrant requirement is based on the recognition that the transient nature of vehicles makes it impractical to secure a warrant before a vehicle believed to contain evidence of criminal activity leaves a particular jurisdiction. *Hill*, 2020 IL 124595, ¶ 21. Although the automobile exception permits warrantless searches of vehicles, a search conducted pursuant to that exception must nonetheless be supported by probable cause. *Id.* ¶ 22.

¶ 39     Probable cause to search a vehicle exists where the totality of the facts and circumstances known to the officer would cause a reasonably prudent person to believe that the vehicle contains contraband or evidence of criminal activity. *Id.* ¶ 23; *Parker*, 354 Ill. App 3d at 947. "Probable cause is a nontechnical concept, not readily reduced to a neat set of legal rules; rather, it is a fluid construct dependent upon the assessment of probabilities in a particular factual context." *Contreras*, 2014 IL App (1st) 131889, ¶ 29. It is the a "pragmatic, nontechnical analysis of 'everyday life on which reasonable and prudent persons—not legal technicians—act.' " *Hill*, 2020 IL 124595, ¶ 23 (quoting *People v. Jones*, 215 Ill. 2d 261, 274 (2005)). When determining whether

probable cause exists, an officer may rely on his law-enforcement training and experiences and make inferences that might evade untrained civilians. *Id.* Because probable cause is a fluid construct and "deals with probabilities, not certainties," an officer is not required to rule out potential innocent explanations for suspicious facts. *Id.* ¶ 24 (citing *Illinois v. Gates*, 462 U.S. 213, 231-32 (1982)). Instead, probable cause "requires only that the facts available to the officer— including the plausibility of an innocent explanation—would warrant a reasonable man to believe there is a reasonable probability 'that certain items may be contraband or stolen property or useful as evidence of a crime.' " *Id.* (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983)).

¶ 40    At the suppression hearing, Officer Guzman recounted the salient details that preceded the search of the Infiniti. He testified, in pertinent part, that he and his partner encountered two vehicles—the Infiniti and a Chevy Trailblazer—in the vicinity of 4441 South Whipple Street when they responded to a ShotSpotter alert that gunshots had been fired around that location. Because they were already patrolling the area, they were able to respond to the alert within "seconds" of it being issued. Respondent was the driver and sole occupant of the Infiniti whereas the Trailblazer contained several individuals. The two vehicles came to a stop in front of a school and as the officers pulled along side the vehicles, Officer Guzman "smelled a strong odor of *** burnt cannabis." He then observed respondent exit the Infiniti with a book bag and approached the rear passenger side of the vehicle. It appeared that respondent retrieved something from his person, dropped something inside the Infiniti, and then joined the occupants in the Trailblazer. At that point, the officers made a U-turn, activated their lights, and commenced a field interview of the occupants. Upon approaching the Trailblazer, Officer Guzman noticed a "strong odor of burnt cannabis emitting from the vehicle." As his partner conducted the interviews, Officer Guzman used his flashlight to illuminate the interior of the Infiniti and observed a bullet on the rear

passenger seat, the area of the car he had seen respondent access moments earlier. When asked, respondent acknowledged ownership of the vehicle and admitted he was not in possession of a valid driver's license. Following those observations and respondent's admissions, Officer Guzman searched the vehicle and recovered the firearm at issue.

¶ 41     Respondent does not dispute the veracity of Officer Guzman's testimony; he simply argues that neither the marijuana smell nor the presence of a bullet in the backseat of the vehicle provided officers with probable cause to believe that the Infiniti contained evidence of a crime and that the circuit court erred in finding the warrantless search of the vehicle was justified pursuant to the automobile exception. We disagree. Initially, we note that "Illinois courts have repeatedly recognized that the distinctive smell of burning cannabis emanating from a vehicle will provide police with probable cause to search a vehicle and all persons seated therein." *In re O.S.*, 2018 IL App (1st) 171765, ¶ 26; see also *Hill*, 2020 IL 124595, ¶ 35 (finding that police possessed probable cause to search the defendant's vehicle where the vehicle contained a "strong odor of cannabis" and the defendant acknowledged smoking cannabis earlier that day). Although respondent suggests that Officer Guzman only detected the smell of burnt cannabis emanating from the Trailblazer, he testified at the suppression hearing that he smelled marijuana as his partner was driving past both of the stopped vehicles. He later confirmed that when respondent and the other occupants were ordered out of the Trailblazer that there was a strong smell of burnt marijuana coming from that vehicle. We do not believe that the record supports respondent's contention that the marijuana smell was limited to the Trailblazer especially given his admission that he had smoked marijuana that day. Accordingly, we find that the marijuana smell provided Officer Guzman with probable cause to believe that the Infiniti contained evidence of unlawful marijuana

possession, which justified the search of the vehicle. *Hill*, 2020 124595, ¶ 35; *In re O.S.*, 2018 IL App (1st) 17165, ¶¶ 26-30.

¶ 42    We further find that the search was justified because Officer Guzman also possessed probable cause to believe the vehicle contained evidence of the recent shooting. As set forth above, he and his partner encountered the Infiniti within "seconds" of receiving a ShotSpotter alert that shots had been fired in that vicinity. He then observed a bullet on the backseat of the vehicle, an area of the vehicle in which he had observed respondent "drop[] something" moments earlier. "Common sense and logic dictate that a bullet is often associated with a gun" and that "a bullet observed inside a vehicle may reasonably indicate the presence of a gun inside that vehicle." *Colyar*, 2013 IL 111835, ¶ 43. Although respondent is correct that mere possession of a firearm is not itself a crime (*People v. Thomas*, 2019 IL App (1st) 162791, ¶ 23), we find that the totality of the circumstances, provided Officer Guzman with probable cause to believe that the Infiniti contained the weapon used in the recent shooting. We reiterate that officers encountered the Infiniti within seconds of the shooting in that area, respondent was observed making movements consistent with placing something in the vehicle, and a bullet was observed on the backseat, the exact area of the Infiniti that respondent had accessed moments earlier. Accordingly, we conclude that the search of the Infiniti was not conducted in violation of respondent's constitutional rights and the circuit court properly denied his motion to suppress.

¶ 43    CONCLUSION

¶ 44    The judgment of the circuit court is affirmed.

¶ 45    Affirmed.